---

(172 App. Div. 467)

### In re MESA'S ESTATE.

(Supreme Court, Appellate Division, First Department.   May 5, 1916.)

1. TAXATION ☞867(1)—TRANSFER TAXES—PROPERTY SUBJECT—DOMICILE OF DECEDENT.

Where deceased, a former resident of Cuba, at all times maintained a home there, but frequently for short periods in the course of journeys to Europe sojourned at New York hotels, but never maintained a residence there, and always intended to return to Cuba, he was not a resident of New York, so as to render his property subject to a transfer tax.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1681; Dec. Dig. ☞867(1).]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **ALIENS** ⬷➡70—NATURALIZATION PROCEEDINGS—COLLATERAL ATTACK.

The state courts must assume the validity of naturalization proceedings, when attacked only collaterally at a date some years after they were had.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 146, 151, 154–160; Dec. Dig. ⬷➡70.]

3. **DOMICILE** ⬷➡4(1)—NATURALIZED ALIEN—CHANGE OF RESIDENCE.

Although deceased became a naturalized citizen of the United States by claiming a residence in New York, where he thereafter returned to his original domicile in Cuba and remained there for a number of years, he became in law and in fact a resident of Cuba.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. §§ 5–8, 10–23; Dec. Dig. ⬷➡4(1).]

4. **WILLS** ⬷➡423—RES JUDICATA—PROBATE PROCEEDINGS—PERSONS CONCLUDED—ALIENS.

Where the will recited the residence of the testator and citizenship in New York, in which state probate proceedings were had, being invoked on the ground of the alleged residence, the surrogate's decree was not res judicata as against the heirs of the decedent residing in Cuba, and they could thereafter dispute the assessment of a transfer tax based upon such decree.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 911–913; Dec. Dig. ⬷➡423.]

5. **WILLS** ⬷➡251—PROBATE—JURISDICTION OF SURROGATE.

The jurisdiction of the Surrogate's Court does not depend upon residence of the decedent within the county, if he has personal property within the state, although residence was the only alleged jurisdictional fact, since by Code Civ. Proc. § 2476, subd. 3, the court has jurisdiction, though the testator be a nonresident, if he has personal property within the county.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 588; Dec. Dig. ⬷➡251.]

6. **WILLS** ⬷➡277—PROBATE—JURISDICTION OF SURROGATE—DUTY TO DISPUTE.

The widow and children of the testator, resident outside the state, are under no obligation to appear and contest the jurisdiction of the surrogate, if it has jurisdiction, though not upon the ground alleged.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 632–635; Dec. Dig. ⬷➡277.]

7. **WILLS** ⬷➡421—PROBATE—CONCLUSIVENESS—DIRECT ATTACK.

The judgment of the surrogate in probating a will, while not subject to collateral attack, is subject to attack in a proceeding opposing the assessment of the transfer tax; that being a part of the process of administration in the same court.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 904–910; Dec. Dig. ⬷➡421.]

8. **ESTOPPEL** ⬷➡1—NATURE—PARTIES AND PRIVIES.

"Estoppel" is an admission or determination under circumstances of such solemnity that the law will not allow the facts so admitted or established to be afterwards drawn in question between the same parties or their privies.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 11–13; Dec. Dig. ⬷➡1.

For other definitions, see Words and Phrases, First and Second Series, Estoppel.]

9. **JUDGMENT** ⬷➡665—CONCLUSIVENESS—"RES JUDICATA."

As a memorial of the fact of the rendition of a judgment the record imports absolute verity, and may be impeached by no one, whether or

⬷➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

not a party to the proceeding; but as precluding a re-examination into the truth of the matters decided it is binding only on parties and their privies, the matters adjudicated being termed "res judicata."

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1177–1179; Dec. Dig. ☞665.

For other definitions, see Words and Phrases, First and Second Series, Res Judicata.]

10. HUSBAND AND WIFE ☞2—TAXATION ☞875(1)—RIGHTS OF WIFE—WHAT LAW GOVERNS.

There being no express contract between husband and wife as to what law shall govern their rights in one another's property, the law of the matrimonial domicile governs as to personal property, which follows the person; so that, though the testator had personal property in New York, but was domiciled in Cuba, the widow, electing to take under the law, and not the will, could have her half of personal property in New York exempted from the transfer tax.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 3, 4, 11; Dec. Dig. ☞2; Taxation, Cent. Dig. § 1690; Dec. Dig. ☞875(1).]

Appeal from Surrogate's Court, New York County.

Proceeding by the Comptroller of the State of New York to assess the transfer tax on the estate of Tirso Mesa y Hernandez, deceased, opposed by Josefina Garcia Pola Mesa, as ancillary guardian, and others. From an order of the Surrogate's Court dismissing an appeal of the State Comptroller from its order assessing the amount of the transfer tax, the State Comptroller appeals. Affirmed.

See, also, 149 N. Y. Supp. 536.

Argued before CLARKE, P. J., and LAUGHLIN, DOWLING, PAGE, and DAVIS, JJ.

Alexander Otis, of New York City (Schuyler C. Carlton, of New York City, on the brief), for appellant.

George W. Phillips, Jr., of New York City (Charles Stewart Davison, of New York City, on the brief), for respondents.

DOWLING, J. [1] Tirso Mesa y Hernandez was born in Cuba on January 28, 1847, and resided continuously there until his marriage on February 24, 1881, to Josefina Garcia Pola, also a native of Cuba. They went to live immediately after their marriage at his sugar plantation, "La Vega," at Manguito, Cuba, which remained their sole family home until 1904, when he purchased a townhouse, No. 2 San Lazaro, Havana, Cuba. He resided in Cuba uninterruptedly from his marriage until the time of his death, save for the years 1895 and 1899, which he spent in Europe because of the Cuban insurrection, and for periods of the other years between 1888 and 1908 when he spent his summers in Europe, with short stays in New York on his way there and on his return. There being no direct passenger service between Cuba and Europe, he was obliged to come to New York to obtain transportation across the ocean. On these trips his wife accompanied him, as well as other members of his family at times, and when in New York they stopped at hotels, never leasing a house or apartment there. Their longest stay in this country was after they reached Porto Rico on their way to Cuba, when they learned (in 1896) that during their European trip their home had been burned down in the course of the

war, whereupon they toured this country as far west as Colorado and then went to Europe, returning to Cuba finally in February, 1900, upon the rebuilding and refurnishing of their home.

Decedent's stays in New York annually thereafter lasted ·from one to five weeks, averaging two weeks. He died on November 29, 1908, at another of his plantations, "Colonia Violet," Aguade de Pasegeros, Cuba, leaving him surviving his widow and three children. He was buried from his city home, and the interment took place in his mortuary chapel in the Christobal Colon Cemetery at Havana, he having given instructions that he should be buried there, no matter where he died. He left realty and personalty in Cuba and personalty in the hands of his bankers in New York. His business interests were entirely in Cuba, save for investments of his funds made by his bankers in New York. He belonged to clubs in Havana only, and his sugar plantations, the source of his wealth, were all in Cuba. His children were educated in England, and returned to Cuba upon completing their studies. His only given address was in Cuba. There could not have been a clearer case of definite and settled residence than that presented by these and numerous other facts and circumstances set forth in the affidavits in the proceeding, and not in any way contradicted.

[2, 3] Nor could any question be raised save for the fact that decedent, for the avowed purpose of protecting his property in Cuba from further attack after his home had been destroyed, took steps to become an American citizen. Accordingly, having at some undisclosed date (but at least two years earlier) declared his intention to become a citizen of the United States, he was duly naturalized on June 23, 1900, in the United States District Court for the Southern District of New York, being then on his way to Europe. To support his application, he furnished an affidavit that he had emigrated to the United States on July 10, 1888, and had resided continuously within the state of New York since July 10, 1888. An affidavit of a witness was furnished that the applicant had resided continuously within the state of New York since June, 1890. Of course, no proof is offered of the fact of such residence in New York, nor, in view of the undisputed facts, could there be any justification of the statements contained in the affidavits. Decedent never emigrated to this country, never resided continuously here for 12 years, nor for 10 years, and in fact never resided here at all.

But, assuming the validity of the naturalization proceedings, as we think we are bound now to do, and that on June 23, 1900, decedent was a citizen of the United States and a resident of the state of New York, the unchallenged facts demonstrate that on his return to Cuba in January, 1901 (he having been in England and on the Continent from July to December, 1900), he resumed his residence in Cuba, established his domicile there, and. retained both until the time of his death, at which time he was in law and in fact a resident of Cuba.

[4, 5] It is further urged that while in New York City, on December 19, 1906 (where he spent a week on his way from England to Cuba), he executed his last will and testament, wherein he was recited as "a native of Colon, in the province of Mantanzas, in the Island of Cuba, but now a citizen of the United States, residing and

domiciled at the city of New York." He named therein four executors and trustees, two of whom were residents of New York City, the others of Havana. The two resident executors petitioned for the probate of the will of decedent, "late of the county of New York, deceased." Citations were prayed to be issued to those interested, including the widow and children, to attend the probate, and January 29, 1909, a decree was made admitting the will to probate, wherein no appearance by any of the parties was recited, but it was set forth that the probate was not contested, that it appeared to the surrogate that the will was duly executed, and that the testator was at the time of executing it in all respects competent to make a will and not under restraint. There was no recital in the decree of decedent's residence in this state, and the petition stated only that he was "late of the county of New York."

But, while decedent left personal property in the county of New York, which would have given the Surrogate's Court power to admit the will to probate (Code Civ. Proc. § 2476, subd. 3), the jurisdiction was not invoked on that ground by the proponents, but on the ground of decedent's asserted residence here, as recited in the will. Decedent's widow has renounced the trust attempted to be created by the will for her life in lieu of all her "legal rights which she might have or claim against any estate left by" him, "whether of dower or of any other kind," and stood upon her legal rights. It appears that decedent left realty in Cuba of the value of over $700,000, in which, under the law of Cuba, his wife was jointly interested with him, and personalty amounting in all to $1,437,571.74 net. He left no realty in New York state, and his personalty therein amounted to $476,773.99 net out of the total before stated. On November 12, 1909, the Court of First Instance of the Western District, Havana, made its decree in a proceeding brought by decedent's widow, adjudging that she was entitled to one-half of the gains (gananciales) acquired during her marriage with him. It is nowhere claimed that either the widow or any of the children of the decedent ever acquired a residence in this state, and even the petition for probate recites them all as residents of Havana, Cuba.

[6] It is the contention of the appellant that, because the respondents were cited to appear upon the probate of the will (the only assigned ground for the jurisdiction of the Surrogate's Court being the residence of decedent in the county of New York), and they failed to appear and contest the same (a special guardian being appointed for the infant respondent), the question of residence being at issue, with the respondents duly made parties to the proceeding, they were bound by the decision on that question, and are estopped from now setting up the claim that the deceased was not a resident of the state of New York. The learned surrogate has held that this contention is incorrect, although conceding that a probate proceeding has been frequently referred to as in the nature of one in rem, in which class of cases a judgment binds not only the parties but all the world. The appellant relies upon the decision in Bolton v. Schriever, 135 N. Y. 65, 31 N. E. 1001, 18 L. R. A. 242, and quotes from the opinion of the court as follows:

"The duty to investigate and decide upon the fact of inhabitancy is necessarily and naturally to be implied from the whole provisions of the statute

relating to wills and their probate, and such duty is to be performed before the will is admitted or letters issued. If no contest is made, and there is no evidence upon the subject of the inhabitancy of the testator one way or the other, except the sworn allegation in the petition, I do not see why the surrogate may not rely upon the fact so stated. Whether, when the fact thus appears in the sworn petition addressed to the surrogate, such fact shall be resworn to by the petitioner or some one else upon an oath administered by the surrogate himself is matter which, it seems to us, is not of a jurisdictional nature. The surrogate may regard the oath taken to the petition as sufficient prima facie evidence, although the statute does not in terms require the fact of inhabitancy to be stated in the petition. If it be so stated and sworn to, and no evidence is offered on the other side, and no issue raised as to the truth of the allegation in any manner or form, the ·decision of the surrogate should be regarded as conclusive, subject only to attack by a direct proceeding to review it."

That was an action of ejectment, brought by the heirs at law of one Talmadge against those claiming under his will, which had been admitted to probate 50 years before by the surrogate of New York county; plaintiff claiming that decedent was actually an inhabitant of Columbia county at the time· of his decease, and that the surrogate of New York county had no jurisdiction to take proof of the will or to grant letters testamentary thereon. The petition in the probate proceeding alleged:

"That deceased was at or immediately previous to his death an inhabitant of the county of New York, by means of which the proving of the will belonged to such surrogate."

The court said (135 N. Y. 69, 31 N. E. 1001, 18 L. R. A. 242):

"The surrogate, in admitting the will to probate and issuing letters testamentary to the executor, in effect decided the fact of inhabitancy, for it was a fact necessary for the surrogate to decide before admitting the will to probate or granting letters, and his decision of that fact, based upon evidence having a legal tendency to support it, ought, it would seem, on general principles, to stand until reversed or set aside, even though it were erroneous."

In the case at bar there is nothing to show what evidence, if any, the surrogate relied upon to establish decedent's residence in New York. In the Bolton Case there was no question raised of Talmadge having been an inhabitant of New York state. The only question raised was as to which of two counties was his actual place of· residence. While the court conceded that the then statute did not require in terms that the surrogate should inquire and determine the fact of inhabitancy, yet they said a fair implication from the whole statute was that the surrogate had the power, and was bound before admitting a will to probate or issuing letters, to institute the inquiry and to decide the fact of inhabitancy (135 N. Y. 70, 31 N. E. 1001, 18 L. R. A. 242) and at the close of the citation relied upon by the appellant the court further said:

"It might happen that, where there is evidence pro and con, the decision would appear to be erroneous, and for that reason it ought to be reversed; but unless direct attack be made upon it, the judgment should remain. This is upon the principle that the surrogate must decide upon some evidence the fact of inhabitancy before he can go further, and when he does so decide, although erroneously, the decision must stand until reversed."

The reasoning of the whole opinion proceeds upon the proposition that the jurisdiction conferred upon the surrogate is upon the estate of deceased inhabitants of the state, and that therefore the decision of the surrogate, founded upon some evidence, must be conclusive, even though erroneous, except upon a direct review. So also in Flatauer v. Loser, 211 N. Y. 15, 104 N. E. 1123, reversing 156 App. Div. 591, 141 N. Y. Supp. 951) the court quoted from the Bolton Case, supra, and said:

"That the surrogate of the county of New York determined that Flatauer at the time of his death was an inhabitant of that county, that he died possessed of certain personal property, and left a last will and testament, which was there admitted to probate, and letters testamentary thereon issued to defendant, appears upon the face of the complaint. Such adjudication cannot be collaterally attacked in this action."

The dissenting opinion in the same case in this court (156 App. Div. 595, 141 N. Y. Supp. 951) shows that the question of testator's residence was litigated in the probate proceeding by Flatauer, the plaintiff in the case, who appeared in opposition to the probate of the will and alleged that the testator was domiciled in the state of Florida, and that question was tried by the surrogate on the probate, and he found as a fact that the decedent was a resident of this state, and therefore admitted the will to probate. In the dissenting opinion of Presiding Justice Ingraham attention was called to the fact that the surrogate undoubtedly would have had jurisdiction to admit the will to probate on the ground that personal property of the testator was located in this state, but that he also had the power and it was his duty to inquire into the inhabitancy of a deceased person whose will was offered for probate, and his adjudication on that fact was conclusive—citing the Bolton Case.

But it seems to me that the case at bar does not come within the rule laid down in either of these cases. In both the Bolton and Flatauer Cases the plaintiffs in the respective actions were attacking the jurisdiction of the Surrogate's Court and seeking to treat as a nullity its decree. No right which they sought to assert could be maintained as long as the decrees in question remained in full force and effect. Here the respondent does not attack the jurisdiction of the Surrogate's Court of New York county nor seek to set aside, disregard, nor in any way qualify or limit the decree admitting the decedent's will to probate. As a matter of fact decedent left personal property in the hands of his bankers in the state of New York, the presence of which securities here gave the Surrogate's Court of New York county jurisdiction to admit the will to probate. The fact of decedent's residence in New York county was not essential to confer jurisdiction upon the Surrogate's Court of that county, even though it was the only jurisdictional fact recited in the petition for such probate. The widow and children were not within the state of New York. They were concededly residents of Havana. The petition showed their nonresidence, and asked for the service of the citation upon them without the state or by publication, and by whichever of these methods service was had they were under no obligation to appear and contest the jurisdiction

of the Surrogate's Court, when in fact it had jurisdiction, even if not upon the ground alleged in the petition.

[7] This is not, like the two cases cited, an effort in an entirely separate action to assert rights different from or in derogation of those adjudged by a decree of the Surrogate's Court. It is an endeavor in a proceeding in the same court incidental to the orderly administration of the decedent's estate to determine the amount of the transfer tax payable to the state of New York. It is not a collateral action, or proceeding in a separate court, but a part of the process of administration in the same court. I do not think, therefore, that the rule laid down in the two cases referred to applies. It seems to me that it comes rather within the reasoning of Matter of Patterson, 146 N. Y. 327, 40 N. E. 990, where letters of administration upon the estate of a decedent had been granted to her surviving husband upon his petition asserting that relationship, without notice to the next of kin or any appearance by them, and where, at a later period, he filed his account, and the same was settled by the surrogate, awarding payment of the whole surplus to him as a husband. Thereafter the next of kin filed a petition alleging that he was never in fact married to the deceased, but had obtained the estate by fraud, and asked to have the decree on the accounting and former distribution set aside, and that the assets in the hands of the administrator be paid over by him to the next of kin.

The appellant contended that, as the next of kin claimed under and in affirmance of the order appointing Patterson administrator, they could not at the same time attack it collaterally. But the court held that they did not attack that order at all, but, recognizing the authority of Patterson as administrator, they asked that he, as lawful administrator, make an honest and lawful distribution. The order appointing the administrator might stand consistently with the relief asked. It is true that in that case the next of kin had not been cited upon the appointment of Patterson; but the position there taken seems to me in line with that taken by the respondents herein, which is that, conceding the jurisdiction of the Surrogate's Court to admit the will to probate, because decedent had property here at the time of his death, they have the right to show the amount of such property and the extent of its taxability, as decedent was a resident of Cuba, and not of the state of New York. Furthermore, the state of New York was not a party to the proceeding for the probate of the decedent's will. In the cases relied on by appellant the question of estoppel arose between those who had either been parties to the original decree or privies of such parties.

[8, 9] Estoppel has been defined as:

"An admission or determination under circumstances of such solemnity that the law will not allow the fact so admitted or established to be afterwards drawn in question between the same parties or their privies." Sly v. Hunt, 159 Mass. 151, 34 N. E. 187, 21 L. R. A. 680, 38 Am. St. Rep. 403.

In relation to judgments the rule is as follows:

"As a memorial of the fact of the rendition of judgment the record imports absolute verity, and may be impeached by no one, whether or not a party to the proceeding in which it was made. As a judgment, on the other hand, the record has the further effect of precluding a re-examination into the truth of the matters decided; but in this aspect it is a rule binding only on par-

ties to the proceeding and their privies. This further and secondary effect of the record considered as a judgment is otherwise known as estoppel by judgment, the matters adjudicated being termed res adjudicata." 16 Cyc. 685.

As was said by Judge Holmes in Brigham v. Fairweather, 140 Mass. 411, 5 N. E. 265:

"Still less do we say why, if a probate is not evidence against a party who had no right to be heard, he should hold the executor bound by it when he himself is free. Ordinarily, estoppels by judgment are mutual."

In the Matter of the Transfer Tax upon the Estate of Frederick Dent Grant, Deceased, 83 Misc. Rep. 257, 144 N. Y. Supp. 567, it appeared that Gen. Grant's widow had filed his will for probate in the Surrogate's Court of New York county, alleging that he was a resident of that county, had qualified as executrix thereunder when probate was allowed, and had filed thereafter with the transfer tax appraiser an affidavit that her late husband died a resident of the city of New York. Yet she was allowed in the transfer tax proceedings to litigate the question of his actual domicile at the time of his decease, and was not deemed estopped from questioning the same, either by the decree of probate or by her own affidavits upon the subject. Her contention that her husband was actually domiciled in federal territory, having abandoned New York City as his residence, and fixed it as Governor's Island, with the intention of removing therefrom to the city of Washington, D. C., on his retirement from the army, was sustained by the surrogate and affirmed by this court. 166 App. Div. 921, 151 N. Y. Supp. 1119.

[10] Having reached the conclusion that the decree admitting the will of decedent to probate was not conclusive in this proceeding, and that the record amply warrants the finding that decedent was not a resident of the state of New York, but of Cuba, at the time of his death, the only other question involved is whether his widow was entitled to a one-half ownership of the joint estate under the law of Cuba, being the so-called "gananciales." The decedent and his wife were married in Cuba, continuously resided there, and the Cuban court, the executors appearing and opposing, determined and upheld her right to such "gananciales" under the Cuban law, which also appears in the record herein. Concededly there was no express contract between the parties, and therefore the law of matrimonial domicile governed, not only as to all the rights of the parties to their property in that place, but also as to all personal property everywhere, upon the principle that movables have no situs, or rather that they accompany the person everywhere, while as to immovable property the law rei sitæ prevails. Story on Conflict of Laws (8th Ed.) 267. It follows that the deduction for the widow's equal half of the joint estate was proper.

The decision in Matter of Majot, 199 N. Y. 29, 92 N. E. 402, 29 L. R. A. (N. S.) 780, is not opposed to this conclusion, for in that case the decedent and his wife had emigrated to this country from France, and actually resided here 22 years, until the time of his death, and all the property, real and personal, of which he died seised or possessed had been acquired after he came to this state.

The order appealed from will therefore be affirmed, with costs. All concur.